Filed 1/30/25  In re V.P. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re V.P., et al., Persons Coming Under the Juvenile Court Law. | B334901 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>N.P.,<br><br>Defendant and Appellant. | (Los Angeles County Super. Ct. No. 23CCJP03286A-B) |

APPEAL from an order of the Superior Court of Los Angeles County, Mary E. Kelly, Judge.  Affirmed.

Lauren K. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Avedis Koutoujian, Deputy County Counsel, for Plaintiff and Respondent.

_____

Newborn R.P. and his then 13–month old half-brother V.P. (born August 2022) were detained from parental care following R.P.'s birth on September 21, 2023, after toxicology screens of both appellant N.P. (mother) and the infant's umbilical cord revealed the presence of, among other things, amphetamine, methamphetamine and marijuana.  Mother admitted having repeatedly used methamphetamine and marijuana during her pregnancy, and as late as a few days before R.P.'s birth.[1]

Mother appeals the juvenile court's orders following a contested adjudication and disposition hearing in which the court removed both boys from her care and placed them temporarily in the care of their maternal grandmother (MGM).  Mother contends the record lacks sufficient evidence to support the court's jurisdictional findings.  Mother also asserts that the juvenile court erred in ordering her sons removed from her care based on its conclusion that her lack of prenatal care, admitted substance abuse, and neglect, placed the young children at substantial risk of physical harm.  Finding no error, we affirm.

## FACTUAL AND PROCEDURAL HISTORY

The family came to the attention of respondent Los Angeles County Department of Children and Family Services (DCFS) shortly after mother tested positive for methamphetamine and marijuana at the time she gave birth to R.P. on September 21, 2023,[2] and mother admitted using those drugs multiple times per

---

[1]	R.P.'s presumed father F.G. (father) is not a party to this appeal, and we relate facts as to him only as they pertain to mother's appeal.  V.P.'s father's whereabouts have remained unknown throughout these proceedings.

[2]	Further date references are to calendar year 2023.

week during her pregnancy, and as recently as three or four days before she gave birth.

On September 25, at DCFS' request, the juvenile court ordered an expedited removal from mother's care for newborn R.P. and his toddler half-brother, V.P. The children were placed in temporary protective custody in MGM's care.

On September 27, DCFS filed a petition pursuant to Welfare and Institutions Code[3] section 300, subdivision (b)(1), alleging that mother had a history of substance abuse before and during her pregnancy. The petition also alleged that mother remained an ongoing user and that her drug abuse interfered with her ability to provide the constant care and supervision required by her two very young sons.[4]

### *Detention*

In its September 28 detention report DCFS noted that mother said she received no prenatal care[5] before R.P.'s birth because a doctor initially told her at 12 weeks that her pregnancy

---

[3] Statutory references are to the Welfare and Institutions Code.

[4] The petition alleged that father was aware of mother's substance abuse, but failed to take action to protect R.P., and that he had a history of substance abuse which interfered with his ability to provide care and supervision for R.P. The petition also alleged that father had a history of arrests and convictions primarily related to possession of controlled substances.

[5] The record is unclear on this point. Mother claimed both that she received no prenatal care, and that she had two prenatal visits. Father reported that mother received no such care. The juvenile court concluded there was ample evidence of mother's "lack of prenatal care."

3

was not viable, and mother elected to let it terminate naturally, which never happened. Mother admitted using methamphetamines and marijuana multiple times per week throughout her pregnancy with R.P. and said she did so because she was angry with father and wanted to retaliate against him because he had been unfaithful and had refused to take her for prenatal care. Mother said she had last used "meth" three or four days before R.P.'s delivery and last smoked marijuana four or five days before delivery.

Mother also told DCFS that it was her habit to drop V.P. at MGM's home, and then use drugs while the child was in MGM's care. Initially, mother left V.P. with MGM for only a day, but those visits later expanded to full weekends. Mother said that the longer V.P. stayed with MGM, the more mother used drugs. MGM claimed no knowledge of mother's substance abuse. MGM was also unaware of mother's pregnancy, which she learned only after she was told to retrieve V.P. from the hospital where mother was in labor. Mother told DCFS that she had anger issues and had been diagnosed with depression. She had been prescribed psychotropic drugs and had enrolled in therapy, but no longer took her medication or attended counseling. Mother informed DCFS that the parents had no supplies for R.P., and that neither of them was prepared to care for the newborn.

DCFS reported the hospital staff's observation that father appeared to be under the influence of drugs or alcohol after he drove mother and V.P. to the hospital. The parents had argued during mother's labor and after R.P.'s delivery. Afterward, mother asked to be separated from both father and her newborn. Mother questioned why she could not be separated from R.P. until a nurse informed her, she needed to care for the infant on

4

her own. After being informed that DCFS would intervene, mother said she wanted to keep R.P. and proclaimed her willingness to cooperate with DCFS, but then asked to leave the hospital prior to her discharge date.

A DCFS social worker met with father at his home on September 25. He acknowledged knowing about–but did not condone–mother's drug use during her pregnancy. Father denied that mother had received any prenatal care before R.P.'s birth, and conceded having made no provisions nor did he have an appropriate plan of care for R.P. DCFS concluded that both children were at risk of harm due to the parents' endangering conduct and requested that the juvenile court remove them from parental care and order appropriate services. Both parents told DCFS they would comply with court orders so they could reunify with R.P.

Following a hearing on September 28, which mother attended, the juvenile court determined that DCFS had made a prima facie case for detention, and that the boys were persons described under section 300. Both children were detained from mother's care. The court permitted mother monitored visitation of at least three hours, thrice weekly, so long as she was not under the influence of drugs or alcohol, and indicated she could have daily visits if MGM (the approved monitor) was amenable. The court ordered mother not to breastfeed her infant until she produced at least six consecutive clean drug tests. DCFS was given discretion to liberalize visits to overnights on the condition that mother's drug tests came back clean. An adjudication hearing was scheduled for November 27.

### *Combined jurisdiction/dispositional hearing*

DCFS submitted its jurisdiction/disposition report on November 9. DCFS reported having attempted unsuccessfully to contact mother eight times between October 26 and November 8 by text message, phone and in person. Mother never made herself available to DCFS and failed to respond to the dependency investigator's (DI) attempts to reach her. Once mother replied to a DI text message by asking "who's this," but never responded after the DI identified herself. On another occasion, mother mistakenly replied to a DI text message with a response intended for someone else stating, "cash app $mikeycts223."

In November, father reiterated to DCFS that mother used methamphetamine and marijuana before her pregnancy. After mother told father she was pregnant, the parents visited a clinic, at which time a doctor told them the baby had no heartbeat. Father did not see mother again until they reunited about a month before R.P. was born. Father said mother denied getting high, but he believed she was using marijuana and methamphetamine; the latter because " 'she got crazy.' " Father told DCFS that he and mother had not lived together until very recently due to mother's housing instability, and the two argued frequently. Father was around V.P. routinely prior to the child's detention. Father reported that he told mother to get into programs. He had allowed her to live with him because she had nowhere else to go and "[i]f [he didn't] let her stay . . . she [would] run to the streets." Father acknowledged being a frequent marijuana smoker and disclosed his own recent methamphetamine use. He declined to submit to an on-demand

6

test after confirming his substance use, saying he " 'would rather wait until the Judge orders it.' "

A maternal aunt (MA) told the DI mother had begun acting erratically, was easily angered, slept a lot, was argumentative and cursed and yelled at others. The aunt and MGM said they had not known mother was pregnant until she went into labor. When MGM visited the hospital, she believed something was wrong because mother picked at scabs on her chest, a behavior the MGM knew was similar to "when you see people who get stuck on meth . . . ." MGM had seen similar marks on mother in the past, but mother claimed were "mosquito bites." MGM said, "sometimes [mother's ]behaviors didn't make sense." After noticing mother had gained weight, MGM asked her if she was pregnant; mother denied that she was. MGM said the family suspected mother was still abusing drugs even after the children were detained because she arrived extremely late for visits with her sons and twice fell asleep during visits about 10 minutes after arriving. MGM said both parents "act[ed] weird [during visitation,] almost falling asleep." MGM believed mother continued to live with father because she had recently overheard an argument in which mother yelled at father over the phone and accused him of breaking her phone and hitting her, and father screamed at mother to leave his home. Father acknowledged that mother continued to live in his home.

DCFS reported that a toxicology screen of R.P.'s umbilical cord was positive for amphetamine, methamphetamine and THC. An initial medical screening of R.P. indicated the infant was born to an ISAM (Infant of Substance Abusing Mother), premised on the presence of mottled skin, and a risk of developmental delay due to prenatal drug and alcohol exposure, and the child

7

experienced withdrawal symptoms.  The hospital's medical staff advised that R.P.'s caretakers minimize environmental stimuli (light and sound) by placing the newborn in a dark, quiet environment, avoiding auto-stimulation by careful swaddling. Caretakers were advised quickly to respond to R.P.'s signals, adopt appropriate positioning and comforting techniques (swaying, rocking), and to frequently give the child small amounts of high-caloric formula to allow for adequate growth. A follow-up was scheduled with a primary care provider and DCFS was asked immediately to undertake Fetal Alcohol Syndrome screening and make Regional Center referrals for both R.P. and V.P.  Medical staff had documented that V.P. had prenatal alcohol (ethanol) exposure in utero.  Both MGM and the MA reported concerns about V.P.'s behavior, including his "extreme and uncontrollable tantrums" following mother's visits. The MA also believed R.P. exhibited symptoms of withdrawal, included trembling in his lip and leg, body shaking and occasionally "bec[oming] stiff[,]" and told DCFS that the newborn cried unusually often for no apparent reason.

DCFS recommended that the juvenile court sustain the section 300 petition.  The agency also recommended that the children be removed from parental custody and that the court order family reunification services, including parenting and individual counseling, weekly drug tests and a full drug program with aftercare.

The combined jurisdiction/disposition hearing was conducted on November 27; mother did not attend.  Mother's counsel requested that the petition be dismissed on the ground that there was no evidence mother was currently abusing drugs. Counsel for the children and DCFS requested that the petition be

sustained and that the children be removed from parental custody.

At the conclusion of the hearing, the juvenile court noted it had considered the evidentiary record and arguments of counsel and sustained the petition in its entirety.[6]  The court observed

---

[6]      As sustained, count b-1 of the petition alleged as to both boys that mother "has a history of substance abuse [and] is a current abuser of methamphetamine, and marijuana which renders mother incapable of providing regular care and supervision  of the children.  [Mother] abused methamphetamine and marijuana during [her] pregnancy with [R.P.]  The children are of such a young age as to require constant care and supervision, and [mother's] substance abuse interferes with providing regular care and supervision of the children. . . . [R.P.'s] father . . . knew of [mother's] substance abuse and failed to take action to protect [R.P.].  [Mother's] substance abuse and [father's] failure to protect [R.P.] endangers the children's physical health and safety, creates a detrimental home environment, and places the children at risk of serious physical harm, damage, danger and failure to protect.

As to father, sustained count (b-2) alleged he had "a history of substance abuse including methamphetamine and is a current abuser of marijuana which renders [him] incapable of providing regular care and supervision of [R.P.]  [R.P.] is of such a young age as to require constant care and supervision and [father's] substance abuse interferes with [his ability to provide] regular care and supervision of [R.P.]."  The petition also alleged that father had been arrested in March 2023 for possession of a controlled substance while armed, and had two criminal convictions, one for possession of a controlled substance and another for bringing a controlled substance into prison.  The petition further alleged that "father's substance abuse endangers [R.P.'s] physical health and safety, creates a detrimental home

9

that mother admitted using drugs throughout her pregnancy, often to retaliate against father. In addition, father, with whom mother lived, admitted having recently relapsed and used meth, and the MA saw R.P. exhibit behaviors she believed were symptoms of withdrawal. The court noted that both children were of tender years and found "there [was] more than ample evidence [to assert jurisdiction] based on mother's admissions" of drug use, her failure to obtain prenatal care and her "obvious" lack of intention to care for R.P. The juvenile court declared both boys to be dependents of the court.

Proceeding to disposition, the court found by clear and convincing evidence that there were no reasonable means to protect the children short of removal and ordered them removed from parental care, and to remain placed with MGM. The court ordered DCFS to provide reunification services permitted mother monitored visits of at least three hours each, three times per week. This timely appeal followed.

## DISCUSSION

On appeal, mother challenges the sufficiency of the evidence supporting the juvenile court's jurisdictional findings and removal order. First, she contends the evidence was insufficient to support the court's jurisdictional findings because DCFS failed to prove she had an ongoing substance abuse problem that placed the children at risk at the time of the adjudication hearing. Second, mother insists the evidence does not support the order removing the boys from her care because DCFS failed to establish, by clear and convincing evidence, that her sons were at substantial risk of serious harm or that

---

environment, and places [R.P.] at risk of serious physical harm, damage and danger."

10

removing them from her care was the only reasonable means to protecting them.[7]  Neither contention has merit.

## 1. *The Jurisdictional Findings are Supported by Substantial Evidence*

### A. *Controlling Legal Principles and the Standard of Review*

The Legislature enacted section 300 to protect children who are currently being abused or neglected and "to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm."  (§ 300.2, subd. (a); *In re N.R.* (2023) 15 Cal.5th 520, 537 (*N.R.*).)  The statute permits the juvenile court to jurisdiction over a child "only so long as is necessary to protect the child from risk of suffering serious physical harm or illness."  (§ 300, subd. (b)(3).)  Thus, "[t]he relevant inquiry . . . is whether circumstances at the time of the jurisdictional hearing ' "subject

---

[7]    Mother's appellate briefs make only passing reference to and provide no substantive legal argument regarding the court's jurisdictional findings or dispositional order as they relate to the toddler V.P.  As appellant, mother bears the burden of demonstrating error through meaningful legal analysis supported by citations to authority and citations to facts in the record that support each claim of error.  (*In re S.C.* (2006) 138 Cal.App.4th 396, 408.)  Mother failed to satisfy this obligation.  Accordingly, we deem her near complete failure to provide relevant argument, or citations to legal authority and pertinent facts, regarding the propriety of the jurisdictional findings and removal order of V.P. from her care to be without foundation and waived.  (*Id.* at pp. 408, 418; *Friends of Juana Briones House v. City of Palo Alto* (2010) 190 Cal.App.4th 286, 313 [an appellant's failure to make a coherent argument in support of a contention of trial court error constitutes waiver of the issue on appeal.].)

the minor to the defined risk of harm." ' " (*In re L.B.* (2023) 88 Cal.App.5th 402, 411 (*L.B.*).)

The juvenile court's exercise of jurisdiction in this action rests on one provision—namely, section 300, subdivision (b)(1). In pertinent part, that provision authorizes the assertion of dependency jurisdiction where a child "has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of" a parent's "failure or inability . . . to adequately supervise or protect the child" or "inability . . . to provide regular care for the child due to the parent's . . . substance abuse." (§ 300, subds. (b)(1)(A) & (b)(1)(D).) A jurisdictional finding under section 300, subdivision (b)(1)(D), requires evidence that (1) neglectful conduct by a parent in at least one specified form (here, prolonged and continued drug abuse) (2) has rendered the parent unable to provide regular care for a child and (3) this inability has caused the child to suffer serious physical harm or illness or has placed the child at substantial risk of such harm or illness. (*N.R., supra,* 15 Cal.5th at p. 558.) Jurisdictional findings must be made by a preponderance of the evidence. (§ 355, subd. (a); *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 248.)

We review a court's jurisdictional findings for substantial evidence, asking whether the record—viewed as a whole and drawing all reasonable inferences in support of the court's findings—contains " " 'sufficient facts to support [its jurisdictional] findings.' " " (*In re I.J.* (2013) 56 Cal.4th 766, 773 (*I.J.*).) We do not reweigh the evidence or exercise our independent judgment, nor do we consider whether there is evidence from which the juvenile court could have drawn a different conclusion. We merely determine if the record,

considered in its entirety, contains sufficient evidence, contradicted or not, to support the juvenile court's findings. (*Ibid*.; accord, *In re R.T.* (2017) 3 Cal.5th 622, 633.) The appellant bears the burden to show there is no substantial evidence to support the juvenile court's order. (*L.B., supra,* 88 Cal.App.5th at p. 412.) Substantial evidence is evidence that is reasonable, credible and of solid value, and "may include inferences, so long as any such inferences are based on logic and reason and rest on the evidence." (*In re Madison S.* (2017) 15 Cal.App.5th 308, 318.)

Here, the juvenile court found DCFS presented sufficient evidence to warrant the assertion of jurisdiction based on its conclusion that mother's historical and ongoing substance abuse posed a substantial risk of severe physical harm or illness to her two young sons. The term "substance abuse" under subdivision (b)(1)(D) is assigned "its ordinary meaning—essentially, the excessive use of drugs or alcohol." (*N.R., supra,* 15 Cal.5th at p. 531.) In this analysis, "a child's youth and maturity level can bear upon the care that the child may require and whether a parent's . . . substance abuse places the child at substantial risk of serious physical harm. Courts can properly take these facts regarding a child into account, together with all other relevant evidence, in deciding whether the government has met its burden at the jurisdictional stage." (*Id.* at p. 559.) The assertion of dependency court jurisdiction based on risk posed by parental substance abuse "requires more than just the identification of substance abuse . . . . A court must also find that the parent . . . is unable to provide regular care for a child and that as a result, the child has suffered serious physical harm or illness or is at

13

significant risk of suffering serious physical harm or illness." (*Id.* at p. 556.)

"Although section 300 requires proof the child is subject to the defined risk of harm at the time of the jurisdiction hearing [citations], the court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child." (*In re Cole L.* (2021) 70 Cal.App.5th 591, 601-602 (*Cole L.*); accord, *In re L.O.* (2021) 67 Cal.App.5th 227, 238 [" 'Although there must be a present risk of harm to the minor, the juvenile court may consider past events to determine whether the child is presently in need of juvenile court protection.' "].) "A parent's " '[p]ast conduct may be probative of current conditions" if there is reason to believe that the conduct will continue.' " (*Cole L.*, at p. 602; accord, *In re J.A.* (2020) 47 Cal.App.5th 1036, 1048.) However, " ' "[t]o establish a defined risk of harm at the time of the hearing, there 'must be some reason beyond mere speculation to believe the alleged conduct will recur.' " ' " (*In re S.F.* (2023) 91 Cal.App.5th 696, 712-713; see also *In re T.V.* (2013) 217 Cal.App.4th 126, 133 [Facts supporting jurisdiction are cumulative, and we consider all the circumstances affecting the child, wherever they occur, bearing in mind that a "parent's past conduct is a good predictor of future behavior."].)

### B. Application

Mother maintains DCFS failed to present sufficient evidence that she currently abused drugs at the time of the adjudication hearing, or that her admitted historical substance abuse rendered her unable to provide regular care and supervision for the children or placed them at substantial risk of serious physical harm.

14

First, the record does not support mother's claim that her substance abuse was purely historical. Mother told DCFS she only used drugs during weekends when V.P. was with MGM. However, she also admitted using drugs multiple times per week and as late as three days before giving birth to R.P. on Thursday, September 21, thereby belying her claim that her drug use was limited to weekends when no child was in her care. Mother admitted using methamphetamine and marijuana regularly (multiple times a week) during a pregnancy, well after she must have understood her pregnancy was viable and continued to abuse drugs until as late as three or four days before R.P. was born. Father corroborated that mother had engaged in substance abuse multiple times per week throughout her pregnancy. MGM also strongly suspected mother's continued substance abuse even after the children were detained, because mother was consistently late for visitations, acted "weird" and, on at least two occasions, abruptly fell asleep within 10 minutes of her arrival.

Moreover, despite her professed willingness to cooperate with DCFS to retain custody of R.P., mother failed to make herself available after his birth, despite the agency's multiple attempts to contact her to discuss and investigate the instant matter and provide appropriate referrals. It was not the case that mother was unreachable. Rather, she chose not to respond to DCFS's multiple attempts–by phone and in person–to contact her. She had a working cell phone. On one occasion DCFS contacted her, and mother simply responded, "who's this?" but never followed up after learning who was trying to reach her. Another time, mother inadvertently responded to a DCFS text with a message intended for someone else. Mother was ordered not to breast feed until she provided at least six consecutive clean

15

tests but chose not to undergo a single drug test. The record also contains evidence that mother's drug use continued unabated after her children's detention, given MGM's and MA's reports of her odd behavior during visits. The court permitted mother monitored visitation with the children at MGM's for up to three hours, three days per week. However, by the time of the November adjudication hearing, two months after the children's detention, MGM reported that mother had visited the children only five times. MGM also said mother arrived very late for visits, stayed only about 15-20 minutes and, at least twice, fell asleep within moments of her arrival. MGM also saw mother pick at marks on her skin, in the way methamphetamine users picked at scabs caused by drug use. The MA also told DCFS she avoided interacting with mother during visits, because mother engaged in erratic behavior and was easily angered.

The record also refutes mother's claim that she was prepared and able to care for R.P. First, mother conceded that she received no prenatal care even after understanding that her pregnancy was viable (or at most, attended two prenatal visits late in her pregnancy). After R.P. was born, mother immediately asked to be separated from the newborn, and hospital staff had to insist that she care for her baby. Mother professed a willingness to cooperate with DCFS and care for the infant, but then requested an early discharge. Mother also admitted that neither she nor father (with whom she continued to reside after R.P.'s birth) had undergone any preparation to care or to provide for the infant, and had no car seat, crib or even the most basic supplies necessary safely to care for and transport an infant. Hospital staff had informed DCFS that, due to his positive drug tests and symptoms of withdrawal, R.P. required special care, including

16

being kept in a dark, quiet environment free of stimuli, special swaddling, a caretaker's immediate response to the child's withdrawal symptoms, and a special feeding routine. Finally, mother had an admitted history of mental health problems, including depression and poor anger management skills, but those issues remained unaddressed due to mother's failure or refusal to take prescribed psychotropic medication or to attend counseling.

In sum, the record readily refutes mother's contention that the juvenile court failed to fulfill its statutory responsibilities by basing its jurisdictional findings solely on a conclusion that mother's historical substance abuse constituted prima facie evidence. Instead, it supports the trial court's finding that she was unable to provide regular care for her sons or had placed them at substantial risk of serious physical harm.

## 2. *Substantial Evidence Supports the Disposition Orders*
### A. *Applicable Law and the Standard of Review*

After the juvenile court exercises jurisdiction over a minor, the court proceeds to a dispositional hearing at which it must decide where the child will live while under juvenile court supervision. (*In re Hailey T.* (2012) 212 Cal.App.4th 139, 145.) To remove a child from parental custody, DCFS must prove by clear and convincing evidence that there is a risk of substantial harm to the child if returned home and the lack of reasonable means short of removal to protect the child's safety. (*In re Yolanda L.* (2017) 7 Cal.App.5th 987, 992; § 361, subd. (c)(1).)

As with the underlying jurisdictional findings, we review a juvenile court's dispositional orders for substantial evidence, guided by the same parameters. (*I.J., supra*, 56 Cal.4th at p. 773.) We draw all reasonable inferences from the evidence to

17

support the juvenile court's order and review the record in the light most favorable to the court's determinations, mindful of the rule that issues of fact and credibility are the province of the trial court. (*Ibid*.) Because section 361, subdivision (c)(1) requires proof by clear and convincing evidence, we account for that heightened standard by determining whether "the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011.) "[T]he appellant bears the burden of showing ' "there is no evidence of a sufficiently substantial nature" ' to support the dispositional removal order." (*In re L.O., supra,* 67 Cal.App.5th at p. 245.)

### B. Application

Mother insists the juvenile court's removal orders were unsupported by substantial evidence that showed a risk of danger to the children at the time of the dispositional hearing. As with her objection to the jurisdictional findings, mother asserts that the removal orders were erroneously based on her admission of prior drug use and an absence of prenatal care. She maintains that neither act amounted to substantial evidence at the time of disposition and asserts there was no evidence she was unwilling or unable to provide regular care for her sons, take them to medical appointments or meet their other needs.

Mother's bare assertions ring hollow. She failed to demonstrate an ability to adequately care for her children, nor any intention to follow through with DCFS after this dependency proceeding began. Rather, mother avoided DCFS's ongoing attempts to reach her to investigate the allegations and provide referrals and services for the family. Following the children's detention, mother failed to undergo drug testing or avail herself

18

of any services afforded by the juvenile court.  In short, by the time of the disposition hearing, mother made no effort to demonstrate her sobriety or ability safely to parent her children. On the contrary, she demonstrated ongoing signs of substance abuse as well as a lack of interest in caring for the children by arriving late for the few monitored visits she did attend (at which MGM believed both mother and father were drug impaired) and, on multiple occasions, an inability to remain awake for more than a few minutes after her arrival.  The court acted well within its discretion to conclude that such inattentive conduct presented an unacceptable risk of serious harm, particularly in light of the children's special needs and tender ages.

In conclusion, mother's behavior following the children's detention demonstrated only an inability to parent two very young children who demanded constant attention to ensure their physical safety.  The record contains no evidence demonstrating or suggesting that mother had made any progress by the time of the dispositional hearing, which she failed to attend.  Rather, her lack of interest or participation in the proceedings and erratic behavior during visits supports a conclusion that she was engaged in ongoing substance abuse.  The fact of mother's regular substance abuse during pregnancy, her inability to remain awake during visits, and behavior indicating ongoing substance abuse after R.P.'s birth, evidenced an incapacity to provide the vigilant, necessary care required by two very young children.  Considered cumulatively, the record contains substantial evidence that the boys would be at substantial risk of harm should they remain or be placed in mother's care.  (See *In re Benjamin D.* (1991) 227 Cal.App.3d 1464, 1470 ["Facts which show the threat of future physical injury to a minor are necessarily cumulative"].)

Accordingly, we conclude that substantial evidence supports the juvenile court's order removing the children from mother's custody.

## DISPOSITION

The juvenile court's jurisdictional findings and disposition orders are affirmed.


                                    RICHARDSON, J.

We concur:


        LUI, P. J.



        CHAVEZ, J.


20